HEARD APRIL TERM, 1873.

### SPRATT *vs.* PIERSON.

A purchaser of real estate at a sale under the Sequestration Act of the Confederate Congress is not entitled, by subrogation or otherwise, to the benefit of a debt of the owner secured by a mortgage of the premises, which the Receiver who made the sale paid in order to give the purchaser an unencumbered title.

Where a plaintiff in equity acts under a decree in his favor, as if it were a mere order of reference reserving the equities, until the re-hearing of an appeal from a second decree dismissing the bill for want of equity, he will not be allowed at such re-hearing to except for the first time to such second decree because it is in conflict with the first.

BEFORE GRAHAM, J., AT CHARLESTON, JANUARY TERM, 1872.

Bill in equity by L. W. Spratt, plaintiff, against John S. Pierson, Abraham G. Jennings, and others, defendants.

The case briefly stated was this:

On the 27th November, 1862, John W. Caldwell, Confederate States Receiver, offered for sale, under the Sequestration Act of the Confederate States, a lot and store on Hayne street in the city of Charleston, of which the defendants above named, who resided in New York, were owners, the terms of sale being one-third cash, and the balance in one and two years. The plaintiff and Edward Pierson, a brother of John S. Pierson, became the purchasers at $10,500. The property was subject at the time to a mortgage given

by the owners to the Provident Institute for Savings, of Charleston, to secure the payment of a bond on which the sum of $6,583.38 was then due and unpaid. Caldwell announced at the sale that he would pay the mortgage debt, and he did so. The plaintiff and Edward Pierson then complied with the terms of sale, paid $3,500 in cash, and gave their bond and mortgage for the balance, and received from the Receiver a conveyance of the lot and store. At the end of one year they paid the bond in full, the plaintiff paying of the entire purchase money, principal and interest, $8,010, and Edward Pierson $3,000. Edward Pierson occupied the property, and at the close of the war he surrendered the possession to the owners. He refused to join in this suit, and plaintiff sued alone, making him a party defendant.

The case was first heard by Carpenter, J., who, on the 1st May, 1869, made a decree as follows:

"On hearing the pleadings and evidence in this cause, and the argument of counsel, it is decreed and ordered that the said complainant be held entitled to be subrogated to the rights of the Provident Institution for Savings, in the city of Charleston, under the bond and mortgage of the defendants, John S. Pierson and Abraham Jennings, set forth in the pleadings, to the extent of the actual value of the funds paid by him towards the same," and he referred it to a Referee to take an account of the amount paid by the complainant and Edward Pierson, and the value thereof in the currency of the United States.

In April, 1870, the case came before His Honor Judge Carpenter on the report of the Referee, and exceptions thereto, and His Honor referred the case back 'to the Referee, with instructions to report the actual value of the $6,583.38 in Confederate currency paid to the Provident Institution for Savings on 1st December, 1862, for the bond and mortgage of the defendants, John S. Pierson and Abraham G. Jennings, by John W. Caldwell, Confederate States Receiver, and the proportions of that value, with interest, to which the complainant and Edward Pierson were entitled "by reason of their contributions to the fund which was pledged. by them for the repayment to the said John W. Caldwell, of the amount so advanced by him for their benefit."

The Referee reported that the value of the fund paid by the plaintiff, with interest thereon to the date of the report, May 9th, 1870, was $2,425.22, and that the value of the fund paid by Edward Pierson, with interest to the same date, was $908.28.

The plaintiff excepted to the report on the grounds: (1) that gold, and no other standards of value, was adopted by the Referee; and (2) that the plaintiff was allowed for so much of his payment as went to the bond, and not for so much as went to the purchase.

In January, 1872, the case came before Judge Graham on the report and exceptions. His Honor reviewed the evidence, and coming to the conclusion therefrom that the bond and mortgage to the Provident Institute for Savings had not been paid by the plaintiff, nor with his money, and that they had been satisfied before he paid anything, he dismissed the bill for want of equity.

The plaintiff appealed on several grounds, setting forth supposed errors in the conclusions of the Circuit Judge upon questions of fact arising from the evidence.

*Hanckel*, for appellant.

*Phillips, Campbell*, contra.

June 6, 1873.   The opinion of the Court was delivered by

MOSES, C. J.   After a re-argument of the cause, and a careful consideration of the points made in behalf of the appellant, we do not see that they present any equitable ground upon which he is entitled to the relief he seeks by his bill.   His claim is rested chiefly, if not entirely, on the principle of subrogation, through which he asks in regard to the bond and mortgage executed by the said John S. Pierson and Abraham G. Jennings, Jr., to the " Provident Institute for Savings in the city of Charleston," to stand in the place of the said corporation, and to set up the mortgage as a valid and binding incumbrance on the real estate referred to in the pleadings.   If he cannot sustain the proposition which he thus submits, there is no ground upon which his bill can stand.

It is not to be denied that the doctrine of subrogation, however limited and restrained its application in the earlier cases in which it was accepted as a principle properly appertaining to the relation between principal and surety, has in more recent times been extended to cases where the nature and character of the transaction clearly brought it within the justice and equity of the doctrine, of which the Court had already taken cognizance between principal and surety.   Therefore, where one, at the request of another, either expressed or implied, advances his money on a debt

for the security of which some lien existed on his property, equity regards the debtor as a constructive trustee, holding it for the benefit of the new creditor, to the same extent and in the same manner in which it was originally bound. It is but the enforcement of a rule which finds its sanction in natural justice, and is, therefore, recognized as springing from the transaction, not properly as a part of the contract, but as a consequence resulting in an equity in favor of the party whose means contributed to the preservation of the property to the debtor, who should not be permitted to retain it, independent of all right on the part of the creditor to compel its devotion to the purpose contemplated at the inception of the lien.

The authorities, to which a reference is unnecessary, so treat the subject, and we cannot conceive how the plaintiff, under the facts and circumstances proved in the case, can ask that he shall be protected by any of the principles which regulate the doctrine on which he founds his claim.

By his own showing he was a party to an illegal proceeding, and it is difficult to perceive how an equity, whether of the character of a resulting or any other trust, can arise from a transaction unlawful on its face, against a party not only innocent of all complication, but one whose constitutional rights were intended to be affected and destroyed by it. It is scarcely necessary to adduce either argument or authority to show that any act of the Congress of the Confederate States, by the mere operation of which alone the freehold of one citizen of the United States could be divested and transferred to another, would be unconstitutional and void, and therefore impotent to confer title. It may not, however, be out of place to fortify the general proposition thus announced, by quoting from the language of the opinion of the Supreme Court of the United States in the case of *U. S.* vs. *Keehler*, 9 Wal., 86 : " It certainly cannot be admitted for a moment that a Statute of the Confederate States, or the order of its Postmaster General, could have any legal effect in making the payment to Clemens valid. The whole Confederate power must be regarded by us as a usurpation of unlawful authority, incapable of passing any valid laws, and certainly incapable of divesting, by an Act of its Congress, or an order of one of its departments, any right or property of the United States. Whatever weight may be given, under some circumstances, to its acts of force, on the ground of irresistible power, or whatever effect may be allowed in proper cases to the

legislation of the States while in insurrection, questions which we propose to decide only when they arise, the Acts of the Confederate Congress can have no force as law in divesting or transferring rights, or as authority for any act opposed to the just authority of the Federal Government."

The plaintiff avers that Caldwell, with his money and as his agent, paid the mortgage, and that he then became entitled to it. This aspect of his claim in no way strengthens it, or affords any right to set up the mortgage against Pierson and Jennings, the mortgagors. His voluntary payment could raise no assumpsit against them, for one cannot become the creditor of another unless by some agreement express or implied, or some subsequent recognition of an existing debt.—Chitty on Contracts, 592; *Richardson* ads. *McCay*, 1 Mills Rep., 472. In notes to the case of *Dering* vs. *Earl of Winchelsea*, 1.W. &. T., Leading Cases in Eq., 94, referring to the authorities which sustain the proposition, it is said "that it is only in cases where the person paying the debt stands in the situation of a surety, or is compelled to pay, in order to protect his own interest, that a Court of Equity substitutes him in the place of the creditor as a matter of course without any special agreement. A stranger paying the debt of another will not be subrogated to the creditor's rights without an agreement to that effect; payment by such a person absolutely extinguishes the debt and security." In *Gadsden* ads. *Brown & Wellsman*, Speer's Eq., 41, Johnson, Ch., says: "The doctrine of subrogation is a pure unmixed equity, having its foundation in the principles of natural justice, and from its very nature never could have been intended for the relief of those who were in a condition in which they were at liberty to elect whether they would or would not be bound, and as far as I have been enabled to learn its history, it never has been so applied. If one with the perfect knowledge of the fact will part with his money, or bind himself by his contract in a sufficient consideration, any rule of law which would restore him his money, or absolve him from his contract, would subvert the rules of social order. It has been directed in its application exclusively to the relief of those that were already bound, who could not but choose to abide the penalty."

The testimony does not sustain the position of the plaintiff that Caldwell acted in the matter as his agent. The object of Caldwell was to confer a clear and unencumbered title on the purchaser. His declaration at the sale evinces it. The forbearance of the

plaintiff to pay the cash portion of the purchase money until the lien of the mortgage was removed shews .the inducement which urged Caldwell to its satisfaction. His purpose was to transfer by the sale an indefeasible title, and this he could not do until he paid the mortgage. The amount applied by Caldwell to its satisfaction was $6,583.38, and yet the cash payment required on the sale, and which was afterwards paid, was only $3,500. How, in this regard, can it be claimed that he acted as the agent of the purchaser? Griggs, the witness, who was the Secretary and Treasurer of the corporation which held the mortgage, states, in his testimony: "Understood him (Caldwell) to say that the store had been sold, and that he took up the bond to make titles." The plaintiff, in his evidence, says "he gave to the Receiver notice that he and Pierson would accept the title upon condition the bond should be taken up. To this the Receiver assented." Trescott, the recording officer, in his examination, says the satisfaction produced (in one of the books of his office) is signed by Griggs, Secretary and Treasurer of P. S. I. The paper of satisfaction was left by Mr. Griggs as a satisfaction of the mortgage. Of this he has no doubt." How, in the face of this proof, can it be said Caldwell, in paying the bond, acted as the agent of the plaintiff, and for his benefit? In one view, in the contemplation of the parties, the Act did enure to his benefit, because, having no doubt that the sale by the Receiver would transfer all the legal rights of the defendants, A. G. Jennings and John S. Pierson, in the premises, the satisfaction of the mortgage removed a lien from the property,' which would have affected it, even if the sale had been valid. Caldwell's purpose was not to sell the mere equity of redemption, and this must have been well understood by the purchasers, else why did he declare at the sale, before the property was knocked off, that the mortgage would be satisfied ? Conceiving that the title to the buyer through the sequestration under the proceeding in the Confederate Court, as whose officer he officiated, would be good and valid, except as to existing encumbrances, his object was to remove the lien which the mortgage created; and thus permit his conveyance to operate as an absolute transfer of the titles of the original owners.

As against them, he was a mere naked trespasser, and the plaintiff who aided in the transaction stood in the same relation. If no rights could be conferred on the purchaser by reason of the trespass to which they were parties, to apply the doctrine of subroga-

tion to any condition which could arise under the transaction, would entirely subvert all the considerations of natural justice to which it owes its origin. Even as between the surety and principal, if the circumstances show that the payment made by the former was with intention to extinguish the lien, which the creditor had as a security, it will be held an extinguishment of it.—See notes to case already quoted, p. 95.

The counsel for the plaintiff in his argument submits as authority from the same case, and the notes appendant to it, that " it is to be presumed that the party by whom the payment was made meant to make it in the way to operate most beneficially, and consequently to keep the debt alive, unless there is enough to show the existence of a contrary intention." Now can there be a doubt of the intention here, when the plaintiff in his evidence admits " that he gave to the Receiver notice that he and Pierson, (Edward), would accept the title upon condition the bond should be taken up ?" It is requiring too much of the Court to infer from the testimony that the plaintiff purchased any legal or equitable claim to the bond and mortgage. They were the impediments in the way of the title which he sought to acquire in the property, and before he complied with the conditions of the sale he required that they should be removed. He supposed he was purchasing whatever estate and title the Confederate government could sell, freed and discharged from the mortgage. If he had a covenant for title, and it has failed, he must resort to his vendor, and it is his own fault if such recourse would not only be unavailing but impossible, for with his eyes open he was content to accept a conveyance through the proceedings of an assumed tribunal which was unconstitutional, and could therefore impress no validity on its acts.

Nor can the plaintiff derive any right from the delivery of the mortgage to him, in 1866, by Griggs, the officer of the "P. I. for Savings."

He distinctly avers, in his testimony, "that after the war it was in his possession still, as the Secretary and Treasurer of the company. Mr. Spratt applied for an assignment of it; refused to give him an assignment of it, because did not know what was on the bond, but delivered the mortgage to Mr. Spratt, knowing that he had been the purchaser, or one of the purchasers, of the store, and that the bond had been paid to make him title. Did not intend it as an assignment, but only as a delivery of the paper to Mr. Spratt, as

the party witness thought entitled to it for whatever use he might make of it." It is clear that no assignment was intended, but even if it had been, it could have conveyed no interest, for the bond had been satisfied nearly four years before the delivery of the mortgage to the plaintiff.

Whatever might have been the opinion of the Court on the effect of the order of Judge Carpenter, of May 1, 1869, if it had been brought to its notice at the proper time, it is now too late for the plaintiff to set it up as a judgment in his favor, rendering the subsequent decree of Judge Graham, dismissing the bill, void and inoperative. On the hearing of the second report of the Referee, Judge Graham, in the language of the brief, " entered into a consideration of the equity of the bill." To this the plaintiff, so far from excepting, did not even make it one of the grounds of his appeal. The case was heard by this Court, and it was not until a re-argument was had that the plaintiff, in his re-argument, made the exception. It comes too late, if for no other reason, that it operates as a surprise on the defendants, who, by the course of the plaintiff, has thus lost the opportunity of appealing from the said order of Judge Carpenter. We do not mean to be understood as saying that the appellant, in this Court, must be restricted to the grounds which may be contained in his notice, but where, on a hearing by one Circuit Judge, all the parties entering into the cause as if the equities remained open for his decision, and no exception taken to such course because it is in conflict with the conclusions of the Circuit Judge who presided at a previous Term and heard the case, this Court, with such objection not noted until it had ordered a re-argument, must regard, as the parties did, the whole case open before the Judge who last heard it.

The motion is dismissed.

*Wright,* A. J., and *Willard,* A. J., concurred.